**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **MARCIE D. RICHARDS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 18 C 354** |
| ) | |
| **ROBERT WILKIE as Secretary of the U.S.** ) | **Judge Rebecca R. Pallmeyer** |
| **Department of Veterans Affairs,**[1] ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Marcie D. Richards worked for the U.S. Department of Veterans Affairs ("VA") for more than 20 years, most recently as a Nursing Assistant at the Captain James A. Lovell VA Federal Health Care Center (the "Lovell VA") in North Chicago. The VA terminated Plaintiff's employment effective July 20, 2016 after it sustained charges against her for inappropriate conduct toward patients and co-workers. In this lawsuit, Plaintiff seeks review of the Merit Systems Protection Board's ("MSPB's") final order affirming the removal decision. (*See* Compl. [1] Count IV.) She also brings claims against Defendant Robert Wilkie, Secretary of the VA, for disability discrimination in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* (*see* Compl. Count I); retaliation for exercising her rights under the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* (*see* Compl. Count II); and retaliation for engaging in protected activity. (*see* Compl. Count III.)[2]

---

[1]     When Plaintiff filed this lawsuit, David J. Shulkin was the Secretary of the U.S. Department of Veterans Affairs. Robert Wilkie succeeded Shulkin in July 2018. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Wilkie is substituted as Defendant.

[2]     Plaintiff has not identified the anti-retaliation statute she is invoking in Count III. (*See id.*; *see generally* Pl.'s Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Opp.") [71].) The court assumes that Plaintiff is proceeding either under the Rehabilitation Act's retaliation provision, 29 U.S.C. § 794(d), or the retaliation provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a). These retaliation provisions "are materially identical." *Twisdale v. Snow*, 325 F.3d 950, 952 (7th Cir. 2003).

Defendant now moves for summary judgment on all claims. Plaintiff petitions for review of the MSPB's final order. As explained here, Defendant's motion for summary judgment is granted and Plaintiff's petition for review is denied.

## PROCEDURAL BACKGROUND

Plaintiff asserts two kinds of claims in this case. The first is brought under Section 7703 of the Civil Service Reform Act ("CSRA"), 5 U.S.C. § 1101 *et seq.* It challenges the MSPB's final order affirming the VA's decision to terminate Plaintiff's employment. In a second type of claim, Plaintiff alleges that the VA engaged in various forms of employment discrimination prohibited by federal law. Federal courts apply different standards of review to these claims.

Under the CSRA, a federal employee has a right to appeal certain adverse employment actions by her agency, such as discharge, to the MSPB. *See Kloeckner v. Solis*, 568 U.S. 41, 43-44 (2012) (citing 5 U.S.C. §§ 7512, 7701). The MSPB is "an independent adjudicator of federal employment disputes." *Kloeckner*, 568 U.S. at 44. The employee's "appeal may merely allege that the agency had insufficient cause for taking the action under the CSRA; but the appeal may also or instead charge the agency with discrimination prohibited by another federal statute," such as Title VII. *Id.* (citing 5 U.S.C. § 7702(a)(1) (listing federal antidiscrimination statutes)). "When an employee complains of a personnel action serious enough to appeal to the MSPB *and* alleges that the action was based on discrimination," she has brought a so-called "mixed case." *Kloeckner*, 568 U.S. at 44 (citing 29 C.F.R. § 1614.302 (2012)).

Petitions to review a final decision of the MSPB are ordinarily filed in the United States Court of Appeals for the Federal Circuit. 5 U.S.C. § 7703(b)(1). When, however, "[a] federal employee . , , claims that an agency action appealable to the MSPB violates an antidiscrimination statute listed in [5 U.S.C. § 7702(a)(1)]," the employee "should seek judicial review in district court, not in the Federal Circuit." *Kloeckner*, 568 U.S. at 56; *see also Miller v. Saul*, 803 F. App'x 963, 966 (7th Cir. 2020) ("We have jurisdiction . . . over 'mixed cases' that also include claims of discrimination."). A court's review of an MSPB decision regarding an adverse employment action

is deferential: the court must affirm the decision unless it is "arbitrary, capricious, an abuse of discretion, not in accordance with law, obtained without proper procedures, or unsupported by substantial evidence." *Delgado v. Merit Sys. Prot. Bd.*, 880 F.3d 913, 916 (7th Cir. 2018) (citing 5 U.S.C. § 7703(c)). The standard for review of statutory discrimination claims, in contrast, is *de novo*. *See* 5 U.S.C. § 7703(c); *see also* 5 U.S.C. § 7703(b)(2) (cross-referencing § 7702).

As discussed in more detail below, the VA terminated Plaintiff's employment in 2016 after determining that she engaged in inappropriate conduct toward patients and co-workers in July and August 2015, respectively. Before the VA made the termination decision, it conducted internal investigations, as required by VA policy. First, Plaintiff's direct supervisor collected written statements from Plaintiff and other employees who witnessed the incidents in question. (*See* Pl.'s Resp. to Def.'s L.R. 56.1 Stat. of Facts ("Pl.'s L.R. 56.1 Resp.") [72] ¶ 11.) Next, the VA directed an Administrative Investigation Board ("AIB") to investigate the charges of misconduct. (*See id.* ¶¶ 35-37.) Among other things, the AIB heard live testimony from Plaintiff and other witnesses on September 30, 2015. (*See id.* ¶ 38.) After the AIB substantiated the charges against Plaintiff, leadership at the VA proposed terminating her employment. (*See id.* ¶ 39.) They gave Plaintiff an opportunity to show that the charges were unfounded by submitting oral and written responses. (*See id.* ¶ 40.) Dr. Stephen Holt, the Director of the Lovell VA, reviewed Plaintiff's responses and decided that she should in fact be terminated. (*See id.* ¶ 50.) As the law requires, in making the decision, Holt was guided by what are known as the *Douglas* factors—"twelve factors to be considered when determining a reasonable penalty for an agency employee." *Robinson v. Dep't of Veterans Affairs*, 923 F.3d 1004, 1016 n.3 (Fed. Cir. 2019) (citing, *inter alia*, *Douglas v. Veterans Admin.*, 5 M.S.P.B. 313, 332 (1981)).[3]

----

[3]     The twelve *Douglas* factors are: "(1) The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated; (2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position; (3) the employee's past disciplinary record; (4) the employee's past work record, including length of

On September 16, 2016, Plaintiff challenged her termination and filed a discrimination complaint with the VA's Equal Employment Opportunity ("EEO") office. (*See* Pl.'s L.R. 56.1 Resp. ¶¶ 56-57.) On January 13, 2017, the Department of Veterans Affairs Office of Resolution Management notified Plaintiff that she did not have a right to an EEOC hearing for the "mixed portion" of her complaint—*i.e.*, the challenge to her termination—and that the mixed portion was being transmitted to the VA Office of Employment Discrimination Complaint Adjudication ("OEDCA").. (*See* Certified Administrative Record ("R") Vol. 1 (Jan. 2017 ORM Ltr.) at 64;[4] *see also* Pl.'s L.R. 56.1 Resp. ¶ 57.) The Office of Resolution Management also informed Plaintiff that if she did not receive a final agency decision on the mixed claim within 120 calendar days of the date she formally filed her complaint, she would have the right to immediately appeal to the MSPB. (R. Vol. 1 (Jan. 2017 ORM Ltr.) at 64; Pl.'s L.R. 56.1 Resp. ¶ 57; *see also* 5 U.S.C. § 7702(e)(2) (providing that if an employee files a mixed case complaint with her agency under § 7702(a)(2) and there is no judicially reviewable agency action after 120 days, "the employee may appeal the matter to the [MSPB] under subsection (a)(1) of this section").)

The parties have not pointed the court to any final agency decision from the VA. (*See, e.g.*, Pl.'s L.R. 56.1 Resp. ¶¶ 57-58.) Thus, the court assumes that Plaintiff did not receive one

---

service, performance on the job, ability to get along with fellow workers, and dependability; (5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties; (6) consistency of the penalty with those imposed upon other employees for the same or similar offenses; (7) consistency of the penalty with any applicable agency table of penalties; (8) the notoriety of the offense or its impact upon the reputation of the agency; (9) the clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question; (10) potential for the employee's rehabilitation; (11) mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and (12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others." *Douglas*, 5 M.S.P.B. at 332.

[4] The Certified Administrative Record was filed on the docket in 12 separate volumes. The court's citations are to the page numbers in each volume. For example, although page 1 of Volume 2 is page 301 of the Certified Administrative Record, the court cites it as R. Vol. 2 at 1.

within 120 days after filing her EEOC complaint and, on March 14, 2017, exercised her right under 5 U.S.C. § 7702(e)(2) to file an appeal with the MSPB. (Pl.'s L.R. 56.1 Resp. ¶ 58.) Over two days in October 2017, an administrative judge ("AJ") for the MSPB heard the testimony of numerous witnesses, including Plaintiff. (*See* Oct. 2017 MSPB Hr'g. Tr. [52-1].) In a written decision dated November 13, 2017, the AJ upheld the VA's termination decision and found against Plaintiff on the discrimination claims, which were characterized as affirmative defenses before the MSPB. (*See* Pl.'s L.R. 56.1 Resp. ¶ 80; Compl. ¶ 9.)[5] The AJ's decision became final on December 18, 2017, and Plaintiff filed this lawsuit on January 17, 2018.

## FACTUAL BACKGROUND

Plaintiff began her employment with the VA in 2004 at a facility in North Chicago. (Def.'s Resp. to Pl.'s L.R. 56.1 Stat. of Add'l Facts ("Def.'s L.R. 56.1 Resp.") [74] ¶ 1.) In 2007, she became a Health Care Technician at the Hines VA, another Chicago-area facility. (*Id.*) In 2011, Plaintiff resigned from that position. (*Id.*) Between 2011 and 2012, she completed her bachelor's degree. (*Id.*) In 2012, the VA hired Plaintiff as a Nursing Assistant at the Lovell VA in North Chicago. (*Id.*; Pl.'s L.R. 56.1 Resp. ¶ 5.) The VA consistently rated Plaintiff as "fully successful" in performance reviews. (Def.'s L.R. 56.1 Resp. ¶ 1.) Effective July 20, 2016, however, the VA terminated Plaintiff's employment, after it sustained charges against her for inappropriate conduct toward patients and co-workers. (*See* Pl.'s L.R. 56.1 Resp. ¶¶ 50-51.)

### A. Plaintiff's Disabilities and Work Restrictions

Plaintiff, who is 60 years old and 4'11", suffers from various disabilities. (Def.'s L.R. 56.1 Resp. ¶ 2.) She has chronic pain caused by injuries sustained while she cared for patients. (*Id.*) She also has degenerative joint disorder, osteoarthritis of the cervical spine, heart problems, asthma, depression, diabetes, and hypertension, among other conditions. (*Id.*) Plaintiff's

---

[5] The employee bears the burden of proving affirmative defenses by the preponderance of the evidence. *See, e.g.*, *Schoenrogge v. Dep't of Justice*, 148 Fed. App'x 941, 944 (Fed. Cir. 2005).

disabilities substantially limit her activities. (*Id.* ¶ 3.) Because of her workplace injuries, the VA placed Plaintiff in a light-duty position around December 22, 2014. (Pl.'s L.R. 56.1 Resp. ¶ 60.) According to a memorandum issued by the VA's Workers' Compensation Program, Plaintiff's responsibilities in the light-duty position included doing "one to one observation" of fall-risk patients, taking patients' vital signs, and helping patients with daily living activities such as bathing, eating, and dressing. (*Id.* ¶¶ 62-63.) Plaintiff signed and initialed the memorandum on January 13, 2015, confirming her acceptance of the light-duty assignment. (*Id.* ¶¶ 63, 65.)

Plaintiff maintains that the light-duty assignment did not accommodate her disabilities. (Pl.'s L.R. 56.1 Stat. of Add'l Facts ("Pl.'s L.R. 56.1 Stat.") [72] ¶ 4.) In a deposition in this case, she testified that she could not perform the assigned work within her restrictions. (Pl.'s L.R. 56.1 Resp. ¶ 68.) Plaintiff's central complaint about the light-duty assignment appears to be that she was required to monitor two fall-risk patients at the same time. (*See id.* ¶ 70; Def.'s L.R. 56.1 Resp. ¶ 19.) Defendant disputes that the light-duty assignment did not accommodate Plaintiff's disabilities. (Def.'s L.R. 56.1 Resp. ¶ 4.) Defendant notes Plaintiff's deposition testimony that she did not perform work that exceeded her lifting restrictions. (*Id.*; *see* Pl.'s L.R. 56.1 Resp. ¶ 66 (Plaintiff's admission that she so testified).) Defendant also points out that the VA's "1:1 Nursing Observation" policy expressly allows for the possibility that "[w]hen multiple patients/residents require close observation, one staff member may supervise up to two (2) patients/residents at once in the same patient/residence room. . . . [W]hen possible, patients/residents should be placed in a two (2) bedroom to decrease non-productive work hours and minimize the drain on staff resources." (Pl.'s L.R. 56.1 Resp. ¶ 69.) Defendant admits that the VA never tried to find Plaintiff an alternative placement but disputes that the Rehabilitation Act required it to do so. (Def.'s L.R. 56.1 Resp. ¶ 4.)

Plaintiff remained in the light-duty assignment until she was removed from patient care and placed in a timekeeping role after incidents in July and August 2015, described below. (*See id.* ¶ 16; Pl.'s L.R. 56.1 Resp. ¶¶ 35, 61.) As far as the court can tell, Plaintiff remained in the

timekeeping role until her termination.

**B.    The July 29-30, 2015 Incident**

In July 2015, Plaintiff was working in the geriatric/psychiatric unit for patients who reside permanently at the Lovell VA.  (Pl.'s L.R. 56.1 Resp. ¶ 7.)  Many of the patients in that unit suffer from psychiatric illnesses, dementia, or depression, and none can care for themselves.  (*Id.*)  From the evening of July 29, 2015 until the next morning, Plaintiff was on duty with Nursing Assistant Andrew Bonjour.  (*Id.* ¶ 8.)  Plaintiff was providing care for two male patients who suffer from dementia and schizophrenia.  (*Id.*)  According to Bonjour's testimony at the October 2017 MSPB hearing, he heard shouting coming from the room where Plaintiff was watching the patients. (*Id.* ¶ 9.)  Bonjour testified that he entered the room and saw Plaintiff "shoving [a patient] up against a wall" in a manner that was "much harder than necessary" as she tried to roll the patient over.  (*Id.* (internal quotation marks omitted).)  He also testified that Plaintiff was yelling at the patient and saying things like, "don't cough in my face, don't act stupid, you know what you're doing." (*Id.* (internal quotation marks omitted).)  Plaintiff admits that Bonjour gave this testimony but disputes its truthfulness.  (*Id.*)  The parties agree that Bonjour was the only witness to the incident.  (*See id.*; Def.'s L.R. 56.1 Resp. ¶ 18.)

On the morning of July 30, 2015, Bonjour e-mailed Wytonya Byrd, the Interim Nurse Manager and Plaintiff's direct supervisor, to inform her that he believed Plaintiff had engaged in patient abuse.  (Pl.'s L.R. 56.1 Resp. ¶¶ 10, 34.)  The e-mail began, "Out of concern for residents and staff, it is my duty to report ongoing negligence and gross unprofessionalism in the course of [Plaintiff's] duties." (*Id.* ¶ 10.)  Among other things, Bonjour wrote that the "residents in [Plaintiff's] immediate care are chastised, berated, and scolded by [Plaintiff] if and when they do not comply with her requests.  As an almost daily witness to this, I am disturbed to the core." (*Id.*)  He added that Plaintiff "regularly" leaves patients unattended, including those who cannot "think or respond normally," and wrote that "it stresses the staff when it falls to us to take over responsibilities [Plaintiff] is well capable of doing, despite her status as light duty." (*Id.*)  Bonjour did not describe

7

the alleged shoving or verbal abuse that he claims to have witnessed on July 29-30, 2015. (*See* Def.'s L.R. 56.1 Resp. ¶ 18.)

The Lovell VA's Patient Abuse policy, dated January 30, 2015, states that "no patient is to be mistreated or abused, either physically, verbally, or financially by any employee" and that "one does not have to intend to abuse a patient to commit patient abuse." (Pl.'s L.R. 56.1 Resp. ¶ 27.) The policy requires employees to report patient abuse if they witness or have knowledge of it, and provides that an AIB will investigate "[a]ll allegations of patient abuse." (*Id.* ¶¶ 28, 32.) If an employee is accused of patient abuse, the policy authorizes the VA to reassign her to a position "out of direct patient contact" or place her on "authorized absence pending the outcome of the investigation." (*Id.* ¶ 29.) Under the policy, "charges of abuse or mistreatment will be sustained if it is found more probable than not that the event(s) occurred." (*Id.* ¶ 30.) The administrative penalty for patient abuse "may be up to and including removal. Any lesser penalty is within the discretion of the deciding official. In taking disciplinary or adverse actions, it is only necessary that abuse or mistreatment be proven by the preponderance of the evidence." (*Id.* ¶ 31.)

In accordance with the Patient Abuse policy, Byrd initiated an investigation into Bonjour's complaint. (*Id.* ¶ 11.) Byrd asked several employees, including Plaintiff and Bonjour, to provide written statements about the July 29-30 incident. (*Id.*)[6] Meanwhile, in accordance with VA policy, Byrd assigned Plaintiff to a timekeeping role; the record does not provide details concerning this assignment other than in this role Plaintiff would not have any contact with patients. (*See* Def.'s L.R. 56.1 Resp. ¶ 16; Pl.'s L.R. 56.1 Resp. ¶ 35.) According to Byrd's testimony at the October

---

[6] The parties do not describe the results of Byrd's investigation or the written statements that Byrd collected from Plaintiff, Bonjour, and other employees. According to the Certified Administrative Record, Plaintiff submitted a written statement to Byrd on August 4, 2015. (*See* R. Vol. 4 (Pl.'s Written Resp.) [50-4] at 34-37.) In her written statement, Plaintiff, denied that she yelled at the patients; noted that because of her lifting restrictions, she cannot change certain patients' diapers without assistance; and stated that Bonjour often refuses her requests for assistance. (*See id.*) As the court discusses below, an AIB conducted an investigation concurrent with or subsequent to Byrd's investigation.

2017 MSPB hearing, she told Plaintiff "not to come to the patient care area" on her next day of work (August 4) and to instead report directly to her.  (Pl.'s L.R. 56.1 Resp. ¶¶ 12-13.)  Plaintiff contends that Byrd only told her not to come to the patient care unit over the weekend.  (*Id.* ¶ 12.)

## C.    The August 4, 2015 Incident

On Monday, August 4, 2015, Plaintiff went to the patient care unit where she would ordinarily report for work.  (*Id.* ¶ 13.)  Three employees were present when Plaintiff entered the room:  Staff Nurse Ana Malene Banlasan, Charge Nurse Ranjeet Grewal, and Bonjour, who was pushing a patient in a wheelchair.  (*Id.*)  At the AIB hearing on September 30, 2015, Grewal testified that Plaintiff approached her and asked whether she (Grewal) had reported Plaintiff.  (*Id.* ¶ 14; *see* R. Vol. 2 (Grewal Tr.) [50-2], at 103:9-14.)  Grewal answered that she had not.  (Pl.'s L.R. 56.1 Resp. ¶ 14.)  Next, Plaintiff approached Bonjour and asked if he had reported her.  (*Id.* ¶ 15.)  Bonjour and Banlasan testified at the October 2017 MSPB hearing that Plaintiff addressed Bonjour in a loud, confrontational tone.  (*Id.* ¶ 17.)  Bonjour further testified that he told Plaintiff that the identity of the complainant is confidential.  (*Id.* ¶ 16.)

Plaintiff then told Bonjour, while pointing her finger in his face, "If you're the person who reported me God help you and your family."  (*Id.* ¶ 18.)  Plaintiff admits that she used these words but contends she was not making a threat.  (*See, e.g., id.* ¶¶ 18, 20.)  Plaintiff claims that she intended her words to be a "friendly gesture."  (*Id.* ¶ 20 (quoting Oct. 2017 MSPB Hr'g. Tr. (Pl. Testimony) at 313:24-314:1).)  She also argues that Bonjour "did not behave as if he felt threatened."  (Pl.'s L.R. 56.1 Resp. ¶ 18.)  Bonjour, on the other hand, testified at the September 30, 2015 AIB hearing that he "absolutely" did feel threatened and in fact responded to Plaintiff by saying, "Marcie, did you just threaten me?"  (*Id.* ¶ 19 (quoting R. Vol 2 (Bonjour Tr.) at 42:24-43:1; 43:2-3).)  Banlasan and Grewal, too, testified at the September 30, 2015 hearing that they interpreted Plaintiff's statement as a threat against Bonjour.  (Pl.'s L.R. 56.1 Resp. ¶ 21.)  Banlasan further testified that she asked Plaintiff to stop discussing the issue in front of patients, but Plaintiff did not listen.  (*Id.* ¶ 22.)  At that point, Banlasan testified, she called the Chief Nursing

Officer (Mary Xavier) and said: "[Plaintiff] is here, and she is causing a lot of disruption." (*Id.* ¶ 23; (quoting R. Vol. 1 (Banlasan Tr.) [50-1] at 243:2-7).) Bonjour spoke with Xavier during the same phone call and stopped interacting with Plaintiff after the call ended. (Pl.'s L.R. 56.1 Resp. ¶¶ 24-25.)[7] It appears that Bonjour, Grewal, and Banlasan went back to work at that point.

The Lovell VA's Workplace Violence Prevention ("WVP") Program, dated July 22, 2013, has a "zero tolerance" policy for behavior that is "disruptive, threatening, violent, or intimidating." (Pl.'s L.R. 56.1 Resp. ¶ 33.) The policy defines a threat as "any verbal or non-verbal expression of a present or future intent to inflict pain or injury or cause mental harm by annoyance or alarm." (*Id.*) Violations of the policy may result in disciplinary action "up to, and including, removal from employment." (*Id.*)

## D.    The AIB Investigation and Plaintiff's Termination

An AIB investigated the July 29-30 and August 4, 2015 incidents. (*See id.* ¶ 37; R. Vol. 1 (Oct. 2015 AIB Mem.) at 163).) During the investigation, Plaintiff remained in the timekeeping role that Byrd assigned to her after the July 29-30 incident. (*See* Pl.'s L.R. 56.1 Resp. ¶¶ 35, 61; Def.'s L.R. 56.1 Resp. ¶ 16.) The investigation included testimony from 10 witnesses, including Plaintiff, Banlasan, Bonjour, Byrd, Grewal, and Xavier. (Pl.'s L.R. 56.1 Resp. ¶ 38; *see* R. Vol. 1 (AIB Index) at 137.) Plaintiff testified that her disabilities prevented her from watching two fall-risk patients at the same time and that she believed she was being reprimanded for whistleblowing activity. (Def.'s L.R. 56.1 Resp. ¶ 19.)[8] The AIB also considered Plaintiff's written response to

---

[7]      According to Defendant, during the phone call, Xavier instructed Bonjour to stop engaging with Plaintiff, "make a report," and call the police if Plaintiff returned to the patient care unit. (Def.'s L.R. 56.1 Stat. of Material Facts ("Def.'s L.R. 56.1 Stat.") [63] ¶¶ 24, 26.) Plaintiff contends that Xavier's alleged statements are inadmissible hearsay. (Pl.'s L.R. 56.1 Resp. ¶¶ 24, 26.) Because Defendant does not respond or argue that the statements fall into an exception to the hearsay rule, the court disregards them.

[8]      The whistleblowing activity is not described in the portions of the record that Plaintiff cites. (*See id.*)

Byrd's inquiry, described above, in which Plaintiff wrote that she could not physically handle certain duties assigned to her. (*See id.*) On October 30, 2015, the AIB concluded that the allegations that Plaintiff verbally abused patients and engaged in workplace violence were substantiated. (Pl.'s L.R. 56.1 Resp. ¶ 37; *see* R. Vol. 1 (Oct. 2015 AIB Mem.) at 172.) Specifically, the AIB found there was evidence that Plaintiff (1) violated the Patient Abuse policy by "speaking loudly and disrespectfully to residents" and (2) violated the WVP Program by making what several witnesses perceived as a "direct threat" against Bonjour. (R. Vol. 1 (Oct. 2015 AIB Mem.) at 172; *see* Pl.'s L.R. 56.1 Resp. ¶ 37.)[9] The AIB's investigation ended in November 2015. (Def.'s L.R. 56.1 Resp. ¶ 20.)

On December 1, 2015, Holt, the Director of the Lovell VA, relayed the AIB's conclusion to the Head of the Extended Care Department (Dr. Ahmad Farooq) and the Associate Director for Geriatrics and Mental Health Services (Dr. David Weis). (*See* R. Vol. 1 (Dec. 2015 Holt Ltr.) at 133.)[10] Holt told them that the Lovell VA would need to follow up with "appropriate administrative actions" against Plaintiff. (*See id.*) On June 3, 2016, Farooq notified Plaintiff of her proposed termination based on two sustained charges: inappropriate conduct toward co-workers and inappropriate conduct toward patients. (*See* R. Vol. 3 (June 2016 Farooq Ltr.) [50-3] at 81; *see* Pl.'s L.R. 56.2 Resp. ¶ 39.) It is undisputed that although the AIB determined that Plaintiff engaged in patient abuse, violated the patient abuse policy, and violated the workplace violence, policy, the Lovell VA did not "charge" Plaintiff with "patient abuse" or "workplace violence." (Def.'s L.R. 56.1 Resp. ¶¶ 21, 23; *see* R. Vol. 3 (June 2016 Farooq Ltr.) at 81 (describing the sustained charges as "inappropriate conduct towards co-workers" and "inappropriate conduct towards

---

[9]     On the other hand, the AIB concluded that the allegation that Plaintiff "shoved" a patient "was not corroborated by others as physical abuse." (R. Vol. 1 (Oct. 2015 AIB Mem.) at 172.)

[10]     The court assumes that Dr. Holt is the supervisor of Drs. Farooq and Weis.

patients").)[11]

Farooq informed Plaintiff that she had a right to submit evidence to Holt, both orally and in writing, to show why the "charges are unfounded." (R. Vol. 3 (June 2016 Farooq Ltr.) at 81.) Plaintiff did both. (*See* Pl.'s L.R. 56.1 Resp. ¶ 40.) In her meeting with Holt—which, according to the record, occurred on June 27, 2016 (*see* R. Vol. 1 (Holt Mtg. Notes) at 116)—Plaintiff denied the allegations underlying the charges, noted that she is disabled and had requested accommodations, and claimed that the Lovell VA was retaliating against her for engaging in protected activity, including filing EEO complaints. (Def.'s L.R. 56.1 Resp. ¶ 22.) The court discusses Plaintiff's prior protected activity below. Dr. Sarah Fouse, one of Plaintiff's supervisors, submitted a letter to Holt as well. (*Id.* ¶ 24; *see* R. Vol. 7 (June 2016 Fouse Ltr.) [50-7] at 44.) She wrote that she has known Plaintiff since 2004; believes Plaintiff is "able to provide the best of patient of patient care"; and thinks that Plaintiff is "dependable and passionate." (Def.'s L.R. 56.1 Resp. ¶ 24.) Fouse acknowledged that Plaintiff sometimes must be asked to "lower her voice" and that she "may display episodes of [post-traumatic stress disorder] depending on the situation which may be perceived as being uncooperative." (R. Vol. 7 (June 2016 Fouse Ltr.) at 44.) Fouse recommended assigning Plaintiff "to a non-patient care area." (*Id.*; *see* Def.'s L.R. 56.1 Resp. ¶ 24.)

Holt decided to terminate Plaintiff, effective July 20, 2016, for inappropriate conduct toward patients and co-workers. (Pl.'s L.R. 56.1 Resp. ¶ 50.) Before making his decision, Holt considered the evidence, including Plaintiff's oral and written responses, and the *Douglas* factors. (Def.'s L.R. 56.1 Stat. ¶¶ 40-41.) He notified Plaintiff of the termination decision in a letter dated July 12, 2016. (*See* R. Vol. 1 (Termination Ltr.) at 109.) In the letter, Holt discussed nearly every *Douglas* factor, identifying each as aggravating, mitigating, or neutral. (Def.'s L.R. 56.1 Stat. ¶ 41.) For

---

[11] Considering the AIB's findings, it is not clear to the court how the charges of inappropriate conduct differ from charges of patient abuse and workplace violence.

example, Holt recognized that Plaintiff "had approximately 20 years of Federal service" and had won two awards for her work in 2005. (Pl.'s L.R. 56.1 Resp. ¶ 45.) There were a number of aggravating factors, however: Holt explained that inappropriate conduct toward patients is more serious where, as here, the patients depend on medical staff for their basic needs. (Def.'s L.R. 56.1 Stat ¶ 42.) He also observed that inappropriate conduct toward co-workers is serious where, as in this case, "it creates a potentially hostile work environment and disrupts safe patient care." (*Id.*) The nature and seriousness of Plaintiff's offenses was an aggravating factor. (*Id.*) Likewise, Holt explained that Plaintiff's "suspension for two specifications of Patient Abuse" less than a year prior—which the court discusses below—was an aggravating factor. (*Id.* ¶ 44.) So, too, was Holt's belief that Plaintiff's "potential for rehabilitation" was "unlikely" given the prior suspension. (*Id.* ¶ 48; *see also id.* ¶ 49 (discussing Holt's conclusion that because Plaintiff's inappropriate behavior had recurred, it was "totally unclear how . . . there are alternative sanctions or measures that would prevent this behavior or minimize risk to patients and other staff").)

### E.    Previous Charge of Patient Abuse Against Plaintiff

Before the incidents at issue in this lawsuit, the VA had charged Plaintiff with two specifications of patient abuse: placing a wipe soiled with feces in a patient's face and engaging in a verbal altercation with the patient on or around May 31, 2013. (Def.'s L.R. 56.1 Stat. ¶ 52; *see* R. Vol. 1 (Sept. 2014 Ltr.) at 28.) It appears that the alleged conduct occurred during a single incident. (*See* R. Vol. 1 (Sept. 2014 Ltr.) at 28.) Based on the charges, the VA suspended Plaintiff from duty and pay for fourteen calendar days beginning on October 26, 2014. (Def.'s L.R. 56.1 Stat. ¶ 52; R. Vol. 4 (Suspension Record) [50-4] at 49-50.) The parties do not explain why so much time passed between the incident and the suspension.

Plaintiff contends that she did not commit the charged offenses. (Pl.'s L.R. 56.1 Resp. ¶ 52.) Instead, she argues that she was "defend[ing] herself from a racist, violent patient who assaulted her" and whom she had "regularly complained about." (*Id.*) In 2013, the VA indeed directed an AIB to investigate an incident in which one of Plaintiff's patients "called her racial slurs

and kicked her in the crotch." (Def.'s L.R. 56.1 Resp. ¶ 6.) The patient abuse and verbal altercation charges against Plaintiff arose from the same incident. (*See id.* (citing R. Vol. 7 (Sept. 2013 Mem.) at 34-43).) Among other things, the AIB determined that "the nurse manager and the charge nurse failed to . . . remove [P]laintiff from caring for the patient." (Def.'s L.R. 56.1 Resp. ¶ 6; *see also id.* ¶ 7 (admitting that according to the AIB, Plaintiff had been "in a situation that was unsafe for her and placed the patient in harm's way," and Plaintiff's supervisor had 17 opportunities to "remove [Plaintiff] from the untenable situation but did not").) The AIB recommended that Plaintiff *and* her supervisors be disciplined, but ultimately, the VA disciplined only Plaintiff. (*See id.* ¶ 7.)

**F.    Plaintiff's Protected Activity**

Plaintiff engaged in protected activity on several occasions during her employment at the VA. In her deposition in this case, Plaintiff testified that around the time she resigned from the VA in 2011, she filed a complaint with the agency's EEO office. (Pl.'s L.R. 56.1 Resp. ¶ 6; *see* Pl. Dep., Ex. 1 to Def.'s L.R. 56.1 Stat. [66] at 32:16-23.) She could not recall the details of the complaint and testified that she resigned because of "irreconcilable differences." (Pl.'s L.R. 56.1 Resp. ¶ 6.) In 2012, after Plaintiff had rejoined the VA, she "initiated the EEO process" because she felt she was being subjected to a hostile work environment. (Def.'s L.R. 56.1 Resp. ¶ 5.) The parties do not state whether Plaintiff filed an EEO complaint, revived the 2011 EEO complaint, or took some other action to start the EEO process. Likewise, the parties do not discuss the details of the 2012 allegations. In April 2013, Plaintiff entered into an alternative dispute resolution agreement with a supervisor, Nikki Spangle (presumably someone implicated in Plaintiff's hostile work environment allegation). (*Id.*) According to Defendant, the dispute resolution agreement "acknowledge[d] [Plaintiff's] physical limitations by stating that [Plaintiff] agreed to 'work to continue to be able to confide in Ms. Spangle regarding my medical and work issues.'" (*Id.* (quoting R. Vol. 5 (Pl.-Spangle Agreement) [50-5] at 147).) The record shows that in the agreement, Plaintiff also stated that she "desire[d] to continue to be trained and mentored by Ms.

14

Spangle." (R. Vol. 5 (Pl.-Spangle Agreement) at 147).)

At some point after April 2013—the parties do not state when—Plaintiff filed complaints with the Office of Special Counsel ("OSC") and the Joint Commission on the Accreditation of Healthcare Organizations ("JCAHO"). (*Id.* ¶ 8.) The complaints concerned patient safety issues and Plaintiff's alleged inability to physically handle the duties she was assigned. (*Id.*) The complaint to the JCAHO "resulted in a facility inspection." (*Id.*) The parties provide no other details about these complaints, nor do they discuss the findings from the facility inspection.

In the MSPB opinion, the AJ stated that Plaintiff filed another EEO complaint in November 2014 against Spangle and another supervisor. (*See* R. Vol. 12 (MSPB Op.) at 252.) The parties, however, do not discuss the 2014 EEO complaint in their Local Rule 56.1 Statements or their briefing on Defendant's motion to dismiss. It is undisputed that Plaintiff's EEO complaints "were sent directly to Holt" in 2014 and 2015. (Def.'s L.R. 56.1 Resp. ¶ 26.)

In February 2016, Plaintiff applied for and was granted leave under the Family Medical Leave Act ("FMLA") because of her medical conditions and her need to care for her disabled child. (Pl.'s L.R. 56.1 Resp. ¶ 76; Def.'s L.R. 56.1 Resp. ¶ 30.) Besides agreeing that Plaintiff took "intermittent" FMLA leave (Def.'s L.R. 56.1 Resp. ¶ 30), the parties do not indicate how much leave she took. Plaintiff admits that Defendant allowed her to "take all the FMLA leave she requested." (Pl.'s L.R. 56.1 Resp. ¶ 76.)

**G.    Comparators**

**1.    Nursing Assistant James Willis**

In March 2015, Holt initiated an AIB investigation into allegations of patient abuse against James Willis, a Nursing Assistant. (Def.'s L.R. 56.1 Resp. ¶ 9.) A patient reported that "Willis tried to push him out of bed" and spit in his face twice; another patient accused Willis of verbally abusing him and being "rough" with another patient; and "Willis was accused of breaking a female patient's hand." (*Id.*; *see* R. Vol. 6 (AIB Willis Report) [50-6] at 296.) A nurse, moreover, reported that Willis yelled, grabbed, and pushed her while they were in a patient's room. (Def.'s L.R. 56.1

Resp. ¶ 9.)  Someone (the record does not identify this person) filed a police report in connection with this last allegation.  (*Id.*)  A nurse filed another police report after Willis allegedly made harassing phone calls to her.  (*Id.*)  Finally, "Willis was accused of sleeping on the job while collecting overtime pay."  (*Id.*)  The parties agree that the AIB "found that there was evidence supporting many of the allegations," but they do not specify which ones.  (*Id.* ¶ 10.)  The court located the information in the record:  the AIB sustained charges against Willis for patient abuse (spitting in a patient's face twice and trying to push him out of his bed) and inappropriate conduct toward a co-worker (yelling, grabbing, and pushing a nurse).  (*See* Vol. 6 (Mar. 2016 Willis Ltr.) [50-6] at 292; Oct. 2017 MSPB Hr'g. Tr. (Holt Testimony) at 172:1-173:9.)  The AIB also noted:

> [Willis] does not acknowledge or recognize either boundaries or [e]thics when dealing with co-workers and patients, and this may be what leads to many of these incidents. He may have signed the Fourteen Principles of Ethical Conduct for Federal Employees, but he does not understand them as his duty, nor does he believe that they pertain to him.

(Def.'s L.R. 56.1 Resp. ¶ 10; R. Vol. 6 (AIB Mitchell Report) at 299.)[12]

Holt proposed terminating Willis's employment, but ultimately gave him a 30-day "paper suspension," meaning that Willis lost neither work shifts nor pay.  (*Id.* ¶ 11.)  The parties agree that before his paper suspension, Willis had never been disciplined for patient abuse.  (Pl.'s L.R. 56.1 Resp. ¶ 54.)  In the MSPB hearing for Plaintiff's case, Holt testified that Willis expressed remorse for his behavior and committed to improving it.  (*Id.* ¶ 55.)

### 2.    Nursing Assistants Patricia Mitchell, Rene Kirklin, and Gwen Hannah

In March 2015, an AIB investigated a patient's complaint that Nursing Assistant Patricia Mitchell "bullied" and "disrespected" her by making "rude," "abusive," and "demeaning" comments.  (Def.'s L.R. 56.1 Resp. ¶ 13.)  Other patients had made similar complaints about Mitchell.  (*See id.*)  The AIB determined that "there was inappropriate communication between" Mitchell and the patient, and that the patient's "feelings were hurt by what [Mitchell] said."  (R. Vol.

---

[12]    The parties do not list the "Fourteen Principles of Ethical Conduct."

7 (AIB Mitchell Report) at 7; *see* Def.'s L.R. 56.1 Resp. ¶ 13.)  It concluded, "It does not appear that there was abuse, but communication could have been handled better."  (R. Vol. 7 (AIB Mitchell Report) at 7.)  The VA did not sustain charges against Mitchell or discipline her.  (*See* Def.'s L.R. 56.1 Resp. ¶ 13.)

In December 2015, an AIB investigated a patient's complaint that Nursing Assistant Rene Kirklin was "rude," "loud," "bossy," and acted like a "bully."  (Def.'s L.R. 56.1 Resp. ¶ 14.)  The AIB determined, "It seems that [Kirklin's] intentions were never to be rude.  She speaks loudly, is authoritative, and is focused on getting the job done.  This is here [sic] style."  (R. Vol. 7 (AIB Kirklin Report) at 31.)  The AIB concluded that the allegation of patient abuse could not be substantiated.  (*Id.* at 30; *see also* Def.'s L.R. 56.1 Resp. ¶ 14.)  The VA did not discipline Kirklin.  (*See* Def.'s L.R. 56.1 Resp. ¶ 14.)

In March 2014, Nurse Manager Joyce Wadlington investigated a patient's allegation that Nursing Assistant Gwen Hannah verbally abused him by using profane language.  (*See* Def.'s L.R. 56.1 Resp. ¶ 12; R. Vol. 7 (Hannah Mem.) at 13.)  Wadlington concluded that "there is non-constructive communication on the unit," but that "further investigation" would be unlikely to reveal "whether the alleged verbal abuse did (or did not) occur."  (R. Vol. 7 (Hannah Mem.) at 14.)  Wadlington recommended that Hannah complete courses on "communication skills" and "working with difficult patients."  (*Id.*)  Plaintiff has identified no evidence that an AIB investigated or sustained the allegations of patient abuse against Hannah.  (*See* Def.'s L.R. 56.1 Resp. ¶ 12.)  The VA did not discipline Hannah.  (*See id.*)

### 3.     Nursing Assistant Bonjour

Plaintiff contends that before the July and August 2015 incidents underlying this lawsuit, she confronted Bonjour "about [his] swearing at patients."  (Pl.'s L.R. 56.1 Resp. ¶ 10.)  She does not provide a citation to the record that shows she did so.  During her meeting with Holt concerning the proposed termination of her employment on June 27, 2016, Plaintiff informed Holt that she had accused Bonjour of patient abuse.  (Def.'s L.R. 56.1 Resp. ¶¶ 15, 22.)  She gave Holt a letter

17

written in June 2016 by Chiquita Marshall, who appears to be a staff member at the Lovell VA. (*See id.* ¶ 15.) Marshall wrote that she heard Bonjour "cursing and talking to our vets in an inappropriate way" and reported the conduct to Plaintiff. (R. Vol. 7 (Marshall Ltr.) at 45.) Marshall wrote that the incident occurred "some time ago." (*Id.*) Holt did not investigate or take disciplinary action against Bonjour after Plaintiff told him about this incident during their June 2016 meeting. (*See* Def.'s L.R. 56.1 Resp. ¶ 15.)

## H.    Plaintiff's Post-Termination EEO Complaint and MSPB Appeal

On September 16, 2016, Plaintiff filed an EEO complaint challenging her removal and alleging age, race, disability, and sex discrimination, reprisal, hostile work environment, and defamation of character. (*See* Pl.'s L.R. 56.1 Resp. ¶ 56; R. Vol. 1 at 61, 88.) The mixed case portion of Plaintiff's complaint (her challenge to the termination decision) was transmitted to the VA Office of Employment Discrimination Complaint Adjudication. (*See* Pl.'s L.R. 56.1 Resp. ¶ 57; R. Vol. 1 (Jan. 2017 ORM Ltr.) at 64).) For the reasons explained above, the court assumes that Plaintiff did not receive a final agency decision within 120 days after she filed her original EEO complaint, and therefore exercised her right to file an immediate appeal with the MSPB. Plaintiff filed her MSPB appeal on March 14, 2017. (Pl.'s L.R. 56.1 Resp. ¶ 58.) The parties do not dispute the timeliness of that appeal. At a prehearing conference before the MSPB, Plaintiff withdrew her affirmative defenses of disparate treatment based on race, age, and sex. (Pl.'s L.R. 56.1 Resp. ¶ 59.)[13]

The MSPB, acting through an AJ, held a hearing on October 17-18, 2017. It heard live testimony from Bonjour, Banlasan, Byrd, Holt, Fouse,[14] and Plaintiff. (*See* Oct. 2017 MSPB Hr'g. Tr. (Index) at 3.) The AJ determined that the VA proved the charges against Plaintiff for

---

[13]    As noted above, the employee carries the burden of proving affirmative defenses by a preponderance of the evidence. *See Schoenrogge*, 148 Fed. App'x at 944; *see also* R. Vol. 12 (AJ Order Granting in Part Agency's Mot. to Compel) [50-12] at 178.

[14]    Fouse is spelled "Faust" in the MSPB Hearing Transcript.

18

inappropriate conduct toward patients and co-workers. (Pl.'s L.R. 56.1 Resp. ¶ 80.) She also determined that the VA did not (1) retaliate against Plaintiff for whistleblowing or EEO activity, (2) fail to accommodate her, or (3) violate her FMLA rights. (*Id.*)

## DISCUSSION

### A.    Defendant's Motion for Summary Judgment

Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute exists, and summary judgment is precluded, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party "bears the burden of demonstrating the absence of genuine issues of material fact." *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019). "If that occurs, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted). When ruling on a motion for summary judgment, a court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255; *see also, e.g.*, *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367 (7th Cir. 2019).

### 1.    Disability Discrimination and Retaliation for Protected Activity

Where, as here, a plaintiff's claims for violations of the Rehabilitation Act and/or Title VII were considered by the MSPB, a federal district court reviews them *de novo*. *See* 5 U.S.C. § 7703(c). Plaintiff argues that Defendant terminated her because of her disabilities in violation of the Rehabilitation Act, which prohibits the federal government from discriminating against a "qualified individual with a disability . . . solely by reason of her or his disability." 29 U.S.C. § 794(a). She also contends that Defendant retaliated against her for engaging in protected activity—specifically, filing complaints with the EEO, OSC, and JCAHO. To prevail on her disability discrimination claim, Plaintiff must show that (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of her job with or without reasonable accommodation;

and (3) the adverse job action was caused by her disability. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017). To prevail on her retaliation claim, Plaintiff must show that (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between her protected activity and the adverse employment action. *See Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018) (Title VII); *Kurowski v. Shinseki*, 557 F. App'x 549, 553 (7th Cir. 2014) (Rehabilitation Act).

The court must consider the evidence "as a whole" to determine whether a reasonable factfinder could conclude that Plaintiff's disability or protected activity caused her termination. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). In discrimination and retaliation cases, the burden-shifting framework articulated in *McDonell Douglas Corp. v. Green*, 411 U.S. 792 (1973), remains a helpful (though not the only) "means of organizing, presenting, and assessing circumstantial evidence." *David v. Bd. of Trs. of Cmty. Coll. Distr. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Under that framework, a plaintiff can establish a *prima facie* case of discrimination or retaliation by showing that (1) she is a member of a protected class; (2) she performed her job reasonably in accordance with her employer's legitimate expectations; (3) she was subjected to an adverse employment action despite her reasonable performance; and (4) similarly situated employees outside of the protected class were treated more favorably by the employer. *See, e.g.*, *David*, 846 F.3d at 225. If the plaintiff makes such a showing, her employer is expected to "articulate a legitimate, nondiscriminatory reason for the adverse employment action," but the plaintiff has the burden of demonstrating "that the employer's explanation is pretextual." *Id.* (internal quotation marks omitted).

Plaintiff relies on the same evidence for her discrimination and retaliation claims, so the court considers those claims together. Moreover, both parties analyze Plaintiff's claims using the *McDonnell Douglas* framework, so the court begins there. Regarding the first factor, it is undisputed that Plaintiff is disabled and therefore is a member of a protected group. Likewise, at least one of Plaintiff's EEO complaints alleged a hostile work environment, and her complaints to

the OSC and JCAHO appear to have requested an accommodation for her disabilities. Defendant does not dispute that Plaintiff engaged in protected activity by filing these complaints. *See also, e.g.*, *Formella v. Brennan*, 817 F.3d 503, 515 (7th Cir. 2016) (plaintiff's EEO complaint alleging race and age discrimination "is a statutorily protected activity") (citing 42 U.S.C. § 2000e-3(a)). Nor is the third *McDonnell Douglas* factor in dispute. Plaintiff suffered an adverse employment action when she was terminated.

The second and fourth *McDonnell Douglas* factors are disputed. Defendant contends that because the VA sustained charges against Plaintiff for inappropriate conduct toward patients and co-workers, Plaintiff cannot establish that she was meeting the VA's legitimate expectations. Assuming her conduct was inappropriate, however, it may not doom her claims here. Plaintiff maintains that other employees likewise failed to meet the VA's legitimate expectations but were disciplined less harshly, and therefore may prevail in establishing an inference of discrimination or retaliation. *See, e.g.*, *Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2011) ("When a black employee produces evidence that he was disciplined more severely than white employees who shared similar shortcomings, the second and fourth elements" of the *McDonnell Douglas* framework merge, and the employee can make a *prima facie* case "if his evidence would establish that the defendants extended leniency to similarly situated white employees who engaged in similar conduct"); *Flores v. Preferred Technical Grp.*, 182 F.3d 512, 515 (7th Cir. 1999) (where the plaintiff "admit[ted] that she broke the rules but claim[ed] that [her employer] disciplined her more harshly than non-Hispanic rule-breakers," it "ma[de] little sense . . . to discuss whether [the plaintiff] was meeting her employer's reasonable expectations"). Therefore, the court considers whether the evidence permits a reasonable jury to conclude that similarly situated employees outside of the protected classes received more favorable treatment from the VA.

"Determining whether other employees are similarly situated requires a 'flexible, common-sense examination of all relevant factors.'" *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 927 (7th Cir. 2019) (internal quotation marks omitted) (quoting *Coleman v. Donahoe*, 667

F.3d 835, 846 (7th Cir. 2012)).  "[P]recise equivalence in culpability between employees is not the ultimate question."  *Coleman*, 667 F.3d at 850 (quoting *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976)).  "Employees must be similar 'in all material respects,' including engaging in identical or comparable misconduct, in order to reveal whether differential treatment is occurring."  *Rozumalski*, 937 F.3d at 927 (quoting *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365-66 (7th Cir. 2009)); *see also Miller v. Saul*, 803 F. App'x at 968  ("To reveal discriminatory discipline, a plaintiff must produce evidence that he engaged 'in identical or comparable misconduct' but received harsher punishment." (quoting *Rozumalski*, 937 F.3d at 927)).  "Whether a comparator is similarly situated is usually a question for the fact-finder, and summary judgment is appropriate only when no reasonable fact-finder could find that plaintiffs have met their burden on the issue."  *Coleman*, 667 F.3d at 846-47 (internal quotation marks omitted).  "In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Id.* at 847 (internal quotation marks omitted).

Plaintiff identifies Nursing Assistants Willis, Mitchell, Kirklin, Hannah, and Bonjour as comparators.  But as Defendant emphasizes, she does not offer evidence that these employees were non-disabled or had not engaged in protected activity.  (*See* Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Br.") [61] at 7.)  More important, she does not offer evidence that they engaged in comparable misconduct and were treated less harshly.  The court begins with Willis, whose misconduct undoubtedly was serious:  the VA sustained charges against him for spitting in a patient's face, trying to push a patient out of bed, and grabbing and pushing a nurse.  Further, the AIB observed that Willis failed to "acknowledge or recognize either boundaries or [e]thics when dealing with co-workers and patients."  (Def.'s L.R. 56.1 Resp. ¶ 10.)  The VA suspended Willis yet terminated Plaintiff for misconduct that is arguably similar.  Defendant argues that there is an explanation for the disparity, however: the VA had not previously charged or disciplined

Willis for patient abuse or violence toward co-workers. (*See* Def.'s Br. at 7.) By contrast, before the incidents giving rise to Plaintiff's termination, the VA had sustained charges against her for placing a feces-soiled wipe in a patient's face and engaging in a verbal altercation with a patient. (*See id.*) Defendant also points out that like Willis, Plaintiff was suspended for her first offense. (*See id.*) Willis's lack of prior discipline is a differentiating circumstance that materially distinguishes the VA's decision to suspend him from its decision to terminate Plaintiff. *See, e.g.*, *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 550 (7th Cir. 2017) (where only the plaintiff had "so many documented [attendance policy] violations" and only the plaintiff had "continued to violate the Policy after being warned of the consequences of his failure to comply," no reasonable jury could find that the employer "treated similarly situated employees more favorably"); *Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 662 (7th Cir. 2016) ("An employee who does not have a similar disciplinary history and performance record as the plaintiff is not similarly situated." (citing *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008)); Def.'s Reply in Supp. of Mot. for Summ. J. ("Def.'s Reply") [73] at 6 (citing *Amrhein*, 546 F.3d at 860)). Accordingly, no jury reasonably could find that Willis was similarly situated and treated more favorably.

Nor could a jury reasonably make that finding for Nursing Assistants Mitchell, Kirklin, Hannah, and Bonjour. True, the VA found some evidence that "there was inappropriate communication between" Mitchell and a patient and that Kirklin speaks loudly to patients. (R. Vol. 7 (AIB Mitchell Report) at 7; R. Vol. 7 (AIB Kirklin Report) at 31.) But in the end, as Defendant emphasizes, the VA determined that the accusations of patient abuse against Mitchell, Kirklin, and Hannah were not substantiated. (*See* Def.'s Reply at 7-8.) Defendant adds that unlike Plaintiff, none of these employees threatened co-workers while the VA was investigating the accusations against them. (*See id.* at 8.) Regarding Bonjour, Defendant notes the the VA did not sustain any charges against him; indeed, Plaintiff did not present the VA with any credible evidence that he engaged in misconduct. (*See* Def.'s Reply at 8 n.3.) In fact, Plaintiff did not raise the issue of Bonjour's alleged patient abuse until after the VA proposed terminating her

employment, and there is no evidence that she reported the alleged abuse contemporaneously. (*See* Def.'s L.R. 56.1 Resp. ¶¶ 15-16.)  Plaintiff does not rebut these representations.  The court agrees with Defendant that the evidence compels a finding that Mitchell, Kirklin, Hannah, and Bonjour were not similarly situated with Plaintiff and treated more favorably.

*Coleman*, cited by Plaintiff, does not require a different conclusion.  (*See* Pl.'s Opp. at 10-11; *Coleman*, 667 F.3d at 859 (reversing summary judgment for the agency on the plaintiff's claims of race and sex discrimination)).  In *Coleman*, the court observed that the comparators' conduct—holding a knife to a co-worker's throat while physically restraining him—was at least as serious as, and "arguably even more" serious than, the indirect threat the plaintiff made against her supervisor.  667 F.3d at 847, 851.  The same cannot be said here, where the VA had not previously disciplined Willis (or, to the court's knowledge, any of the other comparators) and where the allegations against the other comparators were either not sustained or too vague to investigate.  The court is persuaded that no reasonable jury could consider these employees "directly comparable" to Plaintiff "in all material respects."  (Def.'s Reply at 6 (quoting *Coleman*, 667 F.3d at 846).)  Because Plaintiff cannot show that the VA treated similarly situated individuals outside of the protected classes more favorably, she cannot establish a *prima facie* case of discrimination or retaliation. *See, e.g.*, *Formella*, 817 F.3d at 515 ("Failure to satisfy any one element of the *prima facie* case is fatal to an employee's retaliation claim." (internal quotation marks omitted)); *Traylor v. Brown*, 295 F.3d 783, 790 (7th Cir. 2002) (similar).

Plaintiff unsuccessfully argues that Defendant's reasons for her termination—protecting the VA's patients and staff and preventing disruptions to patient care—are pretextual.  (*See e.g.*, Pl.'s L.R. 56.1 Resp. ¶¶ 42, 49 (admitting that Holt articulated these reasons in his consideration of the *Douglas* factors).)  "In determining whether an employer's stated reason [for discharge] is pretextual, the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Monroe*, 871 F.3d at 505 (internal quotation marks omitted).  "Pretext involves more than just

faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Id.* (internal quotation marks omitted).

Plaintiff's reference to Defendant's treatment of similarly situated employees is insufficient to establish pretext because, as explained, the evidence does not show that Defendant treated similarly situated employees more favorably. Plaintiff also urges that Defendant offered inconsistent reasons for her termination and that a jury could find pretext on that basis. But this case is nothing like *Hitchcock v. Angel Corps., Inc.*, 718 F.3d 733 (7th Cir. 2013), cited by Plaintiff. There, the court determined that the defendant's inconsistent reasons for terminating the plaintiff supported an inference of pretext because they either "contradict[ed] the plain language" on the disciplinary form that the plaintiff's supervisor completed or could be deemed "so ludicrous that [the employer] [was] not to be believed." *Id.* at 738

Plaintiff here notes that the VA stated that it was terminating her for patient abuse and workplace violence despite that it charged her only with inappropriate conduct toward patients and co-workers. There is no obvious inconsistency here, however; as Defendant notes, although the VA ultimately "stated [[Plaintiff's] removal charges] as inappropriate behavior towards patients and coworkers," it is undisputed that "the AIB investigation resulted in *sustained* findings that she committed patient abuse and violated the VA's Workplace Violence Prevention Policy." (*See* Def.'s Reply at 9 (citing R. Vol. 1 (Dec. 2015 Holt Ltr.) at 133).) Holt, moreover, concluded that Plaintiff's inappropriate conduct toward patients and co-workers jeopardized patient care as well as the safety of patients and staff. (*See* Def.'s Br. at 9.) The specific label that Defendant attached to her misconduct is not sufficient to support a finding that Defendant's stated reasons for terminating her were lies.

Plaintiff also contends that Holt's testimony establishes pretext with respect to her retaliation. Specifically, she says Holt gave inconsistent testimony about Plaintiff's EEO activity, saying at one point that he was not aware of the activity and later admitting he knew about it. (*See* Pl.'s Opp. at 11.) Plaintiff does not provide a record cite that supports this claim. Defendant

admits that documentation of Plaintiff's EEO activity was sent to Holt in 2014 and 2015 (*see* Def.'s L.R. 56.1 Resp. ¶ 26), but offers persuasive reasons why a reasonable jury could not conclude that Holt's actual reason for firing Plaintiff was to retaliate against her for submitting EEO, OSC, or JCAHO complaints.  First, as Defendant asserts, Plaintiff cannot establish retaliation simply by showing that her protected activity preceded the adverse employment action.  (*See* Def.'s Br. at 11 (citing *Brown v. Ill. Dep't of Nat. Res.*, 499 F.3d 675, 685 (7th Cir. 2007) ("[A]s we have stated on many occasions, timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim." (internal quotation marks omitted))).)  In opposing Defendant's motion, Plaintiff discusses only her EEO activity in 2012 and her complaints to the OSC and JCAHO sometime after April 2013.  (*See* Pl.'s Opp. at 2, 11.)  That protected activity occurred years before the VA charged her with the misconduct resulting in her termination.   Moreover, Defendant emphasizes that none of Plaintiff's prior protected activity implicated Holt (*see* Def.'s Br. at 11), and that there is no evidence that Spangle—against whom Plaintiff directed some of her prior protected activity—had any decision-making role in Plaintiff's termination.  (*See* Def.'s Reply at 12.)  Plaintiff appears to argue that the VA disciplined her for patient abuse in 2013 in retaliation for initiating EEO proceedings in 2012.  (*See* Pl.'s Opp. at 2, 5.)  Defendant makes two compelling points in response.   First, an AIB sustained the 2013 charges after interviewing numerous witnesses.  (Def.'s Reply at 11.)   Second, the *Douglas* factors call for consideration of prior discipline, so Holt's consideration of the discipline Plaintiff received in 2013 was required.  (*See* Def.'s Br. at 11.)  Defendant's arguments satisfy the court that no reasonable jury could find that Plaintiff's protected activity motivated Holt's termination decision.

Regarding inconsistent explanations, Plaintiff next argues that Holt's testimony about how the Lovell VA has disciplined employees for patient abuse supports an inference that his stated reasons for firing Plaintiff were pretextual.  The court disagrees.  Holt told an EEO investigator that during his tenure as the Lovell VA's Director, all employees charged with patient abuse have been terminated.  (*See* Def.'s L.R. 56.1 Resp. ¶ 27.)  He acknowledged in his deposition in this

case, however, that Willis was not terminated for patient abuse. (*See id.*) This inconsistency is not evidence of shifting rationales for Plaintiff's termination, however. First, as noted in Defendant's Local Rule 56.1 Statement, the Lovell VA's Patient Abuse policy provides that the penalty for patient abuse *may be* removal, not that it must be removal. (*See* Def.'s L.R. 56.1 Stat. ¶ 31; Pl.'s L.R. 56.1 Resp. ¶ 31.) Second, as Defendant again emphasizes, Plaintiff—unlike Willis—previously had been disciplined for patient abuse. Holt considered that previous discipline as relevant to the discharge decision. Plaintiff has not established that Defendant "failed to follow its own policies" regarding disciplinary procedures. (Pl.'s Opp. at 12.)

To support her pretext theory, Plaintiff also contends that Holt "admitted he did not look into [her] circumstances" before making his decision. (Pl.'s Opp. at 11.) She again fails to support this argument with a citation to the record (*see* Def.'s Reply at 10), and otherwise undermines it: she admits that Holt met with her, reviewed her written statement, and evaluated the *Douglas* factors in writing before deciding to terminate her employment. (*See* Pl.'s L.R. 56.1 Resp. ¶¶ 40-50.) There is no basis for the claim that Holt terminated Plaintiff without considering the evidence in her case.

Nor does the evidence as a whole permit a reasonable jury to conclude that her disabilities or protected activity caused Defendant to terminate her employment. *See Ortiz*, 834 F.3d at 765. The parties agree that Plaintiff filed EEO, OSC, and JCAHO complaints before she lost her job and that her EEO complaints were sent to Holt in 2014 and 2015 (suggesting he knew about them). But as explained earlier, the mere fact that protected activity preceded the adverse employment action does not permit a reasonable inference of retaliation. Here, where the only protected activity Plaintiff relies upon—and even the November 2014 EEO complaint that the AJ referenced—occurred years before her termination, she has not even offered evidence that the timing of the activity in relation to her termination was suspicious. *See, e.g.*, *LaRiviere*, 926 F.3d at 360 (ten-month interval between protected activity and adverse employment action was "too long to suggest a causal nexus without additional evidence"); *Riley v. City of Kokomo*, 909 F.3d

182, 189 (7th Cir. 2018) (similar conclusion for five-month interval).

The parties agree that although an AIB in 2013 recommended disciplining Plaintiff for patient abuse *and* her supervisors for failing to ensure that Plaintiff was not assigned to care for the patient at issue, the VA disciplined only Plaintiff. (*See* Pl.'s Opp. at 2; *see* Def.'s L.R. 56.1 Resp. ¶¶ 6-7.) Plaintiff appears to suggest that the fact she (but not her supervisors) was punished back then evidences a discriminatory or retaliatory motive for the discipline challenged now. But the supervisors' wrongdoing in 2013 did not involve patient abuse (*see* Def.'s L.R. 56.1 Resp. ¶ 7); by contrast, Plaintiff's wrongdoing in 2013 did (she was found to have wiped a feces-soiled cloth in a patient's face). (*See* Def.'s Reply at 11.) In any event, failure to discipline Plaintiff's supervisors for a 2012 or 2013 incident sheds little light on the propriety of the decision to discharge Plaintiff for her conduct in 2015. On this record, no reasonable jury could conclude that the VA's decision not to discipline Plaintiff's supervisors in 2013 shows that they terminated Plaintiff's employment years later because of her disabilities or protected activity. The court grants Defendant's motion for summary judgment on Plaintiff's claims for disability discrimination and retaliation.

### 2. FMLA Retaliation

Plaintiff contends that Defendant "interfered with [her] FMLA rights" (Pl.'s Opp. at 13; Compl., Count II (asserting claim for an "FMLA violation")), but her arguments reveal that her actual claim is for FMLA retaliation. (*See* Pl.'s Opp. at 13-14 (contending that "a jury could find that there is circumstantial evidence [she] was terminated *for using her FMLA*" (emphasis added)); *see also* Pl.'s L.R. 56.1 Resp. ¶ 76 (admitting that Defendant allowed her to "take all the FMLA leave she requested").) Both sides argue that the court should review Plaintiff's FMLA retaliation claim *de novo.* (*See* Def.'s Br. at 3 (citing 5 U.S.C. § 7703(c)); Pl.'s Petition for Review of an Administrative Decision ("Pl.'s Pet.") [62] at 15.) The court notes that the FMLA is not among the federal antidiscrimination statutes listed in 5 U.S.C. § 7702(a)(1) and cross-referenced in 5 U.S.C. § 7703(b)(2). Indeed, Section 7702(a)(1) lists section 717 of the Civil Rights Act of 1964

(42 U.S.C. 2000e-16), section 6(d) of the Fair Labor Standards Act of 1938 (29 U.S.C. 206(d)), section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791), sections 12 and 15 of the Age Discrimination in Employment Act of 1967 (29 U.S.C. 631, 633a), and "any rule, regulation, or policy directive prescribed under any provision of law described in clauses (i) through (iv) of this subparagraph." 5 U.S.C. § 7702(a)(1)(B). Nevertheless, the court will review Plaintiff's FMLA retaliation claim *de novo*. As explained below, Plaintiff cannot prevail even under this standard, which is more favorable to her than the deferential review the court would otherwise apply to the AJ's decision.

A court assesses "a claim of FMLA retaliation in the same manner that [it] would evaluate a claim of retaliation under other employment statutes, such as the ADA or Title VII." *Burnett v. LFW Inc.*, 472 F.3d 471, 481 n.5 (7th Cir. 2006). For the reasons explained in connection with Plaintiff's Title VII or Rehabilitation Act retaliation claim, Plaintiff cannot make a *prima facie* case of FMLA retaliation using the *McDonnell Douglas* framework. And there is no evidence that would permit a reasonable interference that Defendant terminated Plaintiff because of her FMLA activity.

Arguing otherwise, Plaintiff maintains that the record shows suspicious timing. The AIB completed its investigation of the July and August 2015 incidents in November 2015; Plaintiff began her FMLA leave in February 2016; and Defendant recommended terminating Plaintiff in June 2016, approximately four months after she began her FMLA leave.. According to Plaintiff, Defendant "cannot explain why it waited so long" after November 2015 to terminate her, considering that Defendant believed she posed a threat to patient and staff safety. (Pl.'s Opp. at 13.) The court is not persuaded. As Defendant points out, the VA removed Plaintiff from patient care duties and reassigned her to a timekeeping role in August 2015—so her continued employment was no more threatening to patients and co-workers between August and November 2015 than it was between November 2015 and June 2016. Defendant also explains that after the AIB completed its investigation in November 2015, the Lovell VA had to complete additional levels of review. (*See* Def.'s Reply at 12-13.) Holt had to summarize the AIB's findings in a

memorandum to other Lovell VA administrators (Weis and Farooq), who in turn had to review the file, consider the *Douglas* factors, and propose an appropriate punishment. (*See id.* at 13.) Farooq authorized Plaintiff's proposed removal on May 26, 2016 (*see id.*; *see also* R. Vol. 3 (May 26, 2016 Proposal) at 88)) and notified Plaintiff of the proposal on June 3, 2016. (*See* Def.'s Reply at 13.). The many layers of review available to Plaintiff did consume several months. But apart from the fact that Plaintiff took FMLA leave about halfway through that process, there is no evidence suggesting that her FMLA leave had anything to do with the termination decision. "[M]ere temporal proximity is not enough to establish a genuine issue of material fact" to support a retaliation claim, *Riley*, 909 F.3d at 188 (internal quotation marks omitted), and temporal proximity is all that Plaintiff offers here. On this record, no reasonable jury could find in Plaintiff's favor on her FMLA retaliation claim. The court grants Defendant's motion for summary judgment.

### 3. Age Discrimination

Plaintiff alleges that Defendant terminated her because of her age but does not assert a claim under the Age Discrimination in Employment Act, 28 U.S.C. § 621 *et seq.* (*See, e.g.*, Compl. ¶¶ 1, 47.) Defendant notes that Plaintiff withdrew her affirmative defense of age discrimination before the MSPB. (Def.'s Br. at 4.) As a result, Defendant contends, she has not exhausted her administrative remedies and her age discrimination claim is not properly before this court. (*See id.* at 4-5.) Plaintiff does not dispute this argument. (*See generally* Pl.'s Opp.) Accordingly, even if the Complaint can be construed to assert a claim under the ADEA, the court grants Defendant's motion for summary judgment on that claim. *See Montgomery v. Donahoe*, 602 F. App'x 638, 642 (7th Cir. 2015) ("Because Montgomery did not raise her discrimination claim before the MSPB, she abandoned it and cannot now try to raise it in federal district court.").

### 4. Failure to Accommodate

Plaintiff argues that Defendant violated the Rehabilitation Act by failing to accommodate her disabilities, but she does not assert a failure to accommodate claim in her Complaint. Even if she had, Defendant would be entitled to summary judgment. To prevail on a failure to

accommodate claim, Plaintiff must show (1) she "was a qualified individual with a disability," (2) Defendant "was aware of her disability," and (3) Defendant "failed to reasonably accommodate her disability." *Yochim v. Carson*, 935 F.3d 586, 590 (7th Cir. 2019). "The accommodation obligation . . . brings with it a requirement that both the employer and the employee engage in a flexible interactive process and make a good faith effort to determine what accommodations are necessary." *Id.* at 590-91 (internal quotation marks omitted). An employer, however, need only provide a "reasonable accommodation, not the accommodation [the employee] would prefer." *Id.* at 591 (internal quotation marks omitted). The first two elements are undisputed, so the court focuses on the third.

Plaintiff contends that Defendant "never engaged in the interactive process with [her]" and failed to "follow[] their own procedures" requiring them to find an alternative position that would accommodate her. (Pl.'s Opp. at 12.) But she admits that Defendant offered her a light-duty assignment to accommodate her workplace injuries in December 2014, and that she signed paperwork describing her responsibilities in that position. (*See* Pl.'s L.R. 56.1 Resp. ¶¶ 60-65; Def.'s Br. at 12; Def.'s Reply at 14.) And although Plaintiff argues that she was physically incapable of monitoring two fall-risk patients at once, the paperwork she signed stated that her light-duty position would require one-to-one observation of fall-risk patients. Defendant notes that the VA's one-to-one observation policy, in turn, provides that one-to-one observation can include monitoring two patients in the same room. (*See* Def.'s Br. at 13; Pl.'s L.R. 56.1 Resp. ¶ 69.) Plaintiff also maintains that Defendant ignored her complaints that she was incapable of "manipulat[ing] patients physically" and could not "physically handle" an "abusive" patient. (Pl.'s Opp. at 13.) But as Defendant argues, she admits to testifying that she never performed work that exceeded her lifting limitations and that her co-workers (excepting Bonjour) assisted her upon request. (*See* Def.'s Br. at 12; Pl.'s L.R. 56.1 Resp. ¶ 66.) In these circumstances, no reasonable jury could find in Plaintiff's favor on a failure to accommodate claim, and the court grants Defendant's motion for summary judgment.

31

**B.    Plaintiff's Petition for Review of the MSPB Decision**

The parties agree that Plaintiff's petition to review the MSPB's decision on her mixed-case appeal is properly before this court.  (*See, e.g.*, Def.'s Opp. to Plaintiff's Petition for Review ("Def.'s Opp.") [70] at 4.)  The court must affirm the MSPB's decision unless it is found to be "arbitrary, capricious, an abuse of discretion, not in accordance with law, obtained without proper procedures, or unsupported by substantial evidence."  *Delgado*, 880 F.3d at 916 (citing 5 U.S.C. § 7703(c)).  Under this standard, the court reverses the MSPB's decision only "if it is not supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Hairston v. Dep't of Veterans Affairs*, 761 F. App'x 1005, 1007 (Fed. Cir. 2019) (internal quotation marks omitted) (quoting *Haebe v. Dep't of Justice*, 288 F.3d 1288, 1298 (Fed. Cir. 2002)).  "The choice of penalty," moreover, "is committed to the sound discretion of the employing agency and will not be overturned unless the agency's choice of penalty is wholly unwarranted in light of all the relevant factors."  *Guise v. Dep't of Justice*, 330 F.3d 1376, 1382 (Fed. Cir. 2003).

As discussed above, the court has already concluded, on *de novo* review, that Defendant is entitled to summary judgment on Plaintiff's discrimination claims.  Plaintiff's arguments that the reasons for her termination were arbitrary and capricious fail, as well

**1.    Definition of the Charges**

Plaintiff contends, first, that the AJ did not properly define the elements of the inappropriate conduct charges.  (Pl.'s Pet. at 6-7.)  According to Plaintiff, the AJ merely determined that she committed the alleged acts and then concluded that her termination was justified because the VA deemed the acts inappropriate.  (*Id.* at 7.)  Plaintiff argues that the AJ's approach allows an agency to violate an employee's right to due process by failing to provide meaningful notice of the charges against her.  (*See id.* at 6-7.)

In *LaChance v. Merit Systems Protection Board*, 147 F.3d 1367 (Fed. Cir. 1998), cited by Plaintiff, the court stated that an agency "must prove all the elements" of the charge it designated

"as the basis for the proposed discipline" and explained that due process principles require agencies to put employees on fair notice of the charges against them and to prove what is charged. *See id.* at 1371-72. Thus, when an agency uses a "general charge label[]" such as "inappropriate behavior" and the charge specification "contains the only meaningful description of the charge," the agency "must prove what it has alleged in the specification." *Id.* The court agrees with Defendant that the AJ applied this standard here. (*See* R. Vol. 12 (MSPB Op.) at 256 (recognizing that "[a] charge of inappropriate conduct is a generic charge" that "must be construed in light of the accompanying specifications") (citing, *inter alia*, *LaChance*, 147 F.3d at 1372); Def.'s Opp. at 6). And as discussed below, she evaluated whether the VA proved, by a preponderance of the evidence, that Plaintiff had committed the acts described in the charge specifications. Therefore, the fact that the AJ did not "define" the elements of the charges does not render her decision arbitrary, capricious, or unsupported by substantial evidence. *Hanner v. Dep't of Army*, 55 M.S.P.R. 113 (M.S.P.B. 1992), also cited by Plaintiff, does not counsel otherwise. As Defendant notes, the AJ in *Hanner* erred by reading a non-existent element into a charge, not by failing to define the elements or construe a general charge according to the specification. (*See* Def.'s Opp. at 6-7 (citing *Hanner*, 55 M.S.P.R. at 119).)

2.    **Proof of the Charges**

Plaintiff also argues that the AJ erred in finding that the VA proved the charges described in the specifications. Again, the court disagrees.

a.    **Inappropriate Conduct Toward Co-Workers**

The charge for inappropriate conduct toward co-workers alleged that Plaintiff told Bonjour, "May God help you and your family if you reported me," or words to that effect, while she was pointing her finger in Bonjour's face. (R. Vol. 12 (MSPB Op.) at 256; *see* R. Vol. 3 (June 2016 Farooq Ltr.) at 81.) It also alleged that Plaintiff's conduct was "disruptive." (*Id.*) Plaintiff contends that the VA did not prove her conduct was disruptive because the incident lasted "mere moments," and no one testified that the VA's operations were disrupted. (Pl.'s Pet. at 7-8.) But the AJ's

finding otherwise was adequately supported by Banlasan's testimony that she called a supervisor during the incident and stated, "[Plaintiff] is having an argument with Mr. Bonjour and *it's causing a lot of distraction and trouble.*" (Oct. 2017 MSPB Hr'g. Tr. (Banlasan Testimony) at 63:10-15 (emphasis added); *see* Def.'s Opp. at 8 (citing same).)

The fact that Bonjour did not flee or call the police also does not defeat a finding that Plaintiff uttered threatening words. In making this finding, the AJ considered live testimony from Bonjour and Banlasan and contemporaneous written statements from Bonjour and Grewal, all of whom witnessed the incident. (*See* R. Vol. 12 (MSPB Op.) at 256-57, 261.) As Defendant notes, the witnesses discussed what Plaintiff said, the tone she used, and how they perceived her words, and the AJ observed that their statements were credible and "internally consistent." (*Id.* at 256-61; Def.'s Opp. at 8.) The AJ also heard live testimony from Plaintiff and explained why her suggestion that the threat was instead a "friendly gesture" was not credible. (*See* R. Vol. 12 (MSPB Op.) at 258-60.) Among other things, the AJ noted that Bonojur, Banlasan, and/or Grewal called two supervisors for assistance during the incident, which "strongly discredits [Plaintiff's] account that she was acting 'friendly' and appropriately." (*Id.* at 258-59.) A reasonable person would accept this evidence as adequate to support the conclusion that the VA proved the charge as written.[15]

Plaintiff finds significance in the fact that the VA charged her with inappropriate conduct toward co-*workers* but identified just one co-worker (Bonjour). The charge specification, however,

---

[15]     In a footnote, Plaintiff argues that the AJ failed to apply the appropriate legal standard for assessing whether words constitute a threat. (*See* Pl.'s Pet. at 8 n.2 (citing *Metz v. Dep't of Treasury*, 780 F.2d 1001 (Fed. Cir. 1986)).) Although the AJ did not cite *Metz*, she considered several of the factors the court identified in that case: the "listener's reactions," "listener's apprehension of harm," "speaker's intent," and "attendant circumstances." *Id.* at 1002. The *Metz* court observed that a person who calls the police after hearing a statement is more likely to have heard a threat than someone who does not, *see id.* at 1003; it did not suggest that evidence that police were called is necessary to prove that a threat was made. Defendant, for his part, argues that "Bonjour need not run to make [Plaintiff's] threat constitute inappropriate and disruptive behavior." (Def.'s Opp. at 8.)

stated that Plaintiff "approached [Bonjour] *in front of other staff and patients*" (R. Vol. 3 (June 2016 Farooq Ltr.) at 81 (emphasis added)), and as Defendant argues, a reasonable person would accept the description of the charge, as well as the witness statements and testimony, as evidence showing that Plaintiff's behavior affected everyone present. (*See* Def.'s Opp. at 8.) Finally, Plaintiff urges that the VA failed to prove the charge because Holt testified that his decision to impose discipline was based in part on his mistaken belief that at the time of the incident, Plaintiff was not supposed to be in the patient care unit at the time of the incident. Whether Plaintiff was in fact authorized to be in the unit is disputed, but Holt testified that Plaintiff's conduct was inappropriate regardless of whether she was authorized to be there. (*See* Oct. 2017 MSPB Hr'g. Tr. (Holt Testimony) at 205:15-17.) The AJ's conclusion that the VA proved the charge of inappropriate conduct toward co-workers by a preponderance of the evidence was not arbitrary, capricious, or unsupported by substantial evidence.

### b.    Inappropriate Conduct Toward Patients

The "inappropriate conduct toward patients" charge was based on evidence that on July 29-30, 2015, a co-worker observed Plaintiff telling a patient, "don't act stupid, you are getting on my nerves, and stop coughing in my face," or words to that effect. (R. Vol. 3 (June 2016 Farooq Ltr.) at 81.) The charge further stated that Plaintiff's behavior was disrespectful. (*Id.*) Plaintiff contends, first, that the VA did not prove the charge because "it provided no evidence that the patients were aware of the alleged comments." (Pl.'s Pet. at 8.) This argument is a nonstarter. Defendant correctly notes that the patients in question suffered from mental illnesses, and they deserved respectful treatment regardless of whether they could understand what was going on around them. (*See* Def.'s Opp. at 9.) Second, Plaintiff emphasizes that Bonjour was the only witness, and no one corroborated his account. But Defendant observes that according to the AJ, Bonjour's testimony about the incident at the MSPB hearing "was consistent with his prior written and oral statements," including the e-mail he sent to Byrd on July 30, 2015. (R. Vol. 12 (MSPB Op.) at 252-53, 262; *see* Def.'s Opp. at 9-10.) The AJ also considered testimony from Banlasan

and Byrd that they observed Plaintiff engaging in similar behavior (such as screaming at patients) on other occasions. (R. Vol. 12 (MSPB Op.) at 262-63.) This evidence corroborates Bonjour's account and is adequate to support the conclusion that Plaintiff engaged in inappropriate conduct toward patients. Finally, Plaintiff maintains that because she had health issues, it was not disrespectful to ask a patient not to cough on her. Maybe, but there is also evidence that Plaintiff called a patient stupid and told a patient he or she was getting on her nerves. Plaintiff does not dispute that such statements showed disrespect. The AJ's conclusion that the VA proved the charge of inappropriate conduct toward patients by a preponderance of the evidence was not arbitrary, capricious, or unsupported by substantial evidence.

### 3. Nexus

Plaintiff also maintains that the VA failed to prove by a preponderance of the evidence a nexus between her job and the alleged conduct, and that the AJ erred in finding otherwise. An agency may remove an employee "only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a). "To satisfy that requirement, the agency must show by preponderant evidence that there is a nexus between the misconduct and the work of the agency, *i.e.*, that the employee's misconduct is likely to have an adverse impact on the agency's performance of its functions." *Brown v. Dep't of Navy*, 229 F.3d 1356, 1358 (Fed. Cir. 2000). According to Plaintiff, the VA failed to meet its burden because performance evaluations always stated that she was "fully successful" and the VA "presented no evidence" that the alleged misconduct interfered with her co-workers' performance or patient care. (Pl.'s Pet. at 8.) This argument simply ignores the evidence that Plaintiff disrupted co-workers while they were on the job and disrespected vulnerable patients. That conduct, the AJ determined, interfered with the VA's mission, which is to care for and treat veterans. (R. Vol. 12 (MSPB Op.) at 274-75; *see also* Def.'s Opp. at 10 (arguing that Plaintiff's job was to appropriately care for patients).) Likewise, the AJ observed that employees who work at the VA have a "right to work in a safe and professional work environment free from unwelcome and inappropriate contact, whether it be

36

verbal or physical." (R. Vol. 12 (MSPB Op.) at 274-75.) A reasonable person could conclude from the evidence, as the AJ did, that Plaintiff's conduct interfered with that right.

Plaintiff also suggests that the finding of a nexus between her conduct and job performance is defeated by evidence that her co-workers were not disciplined for engaging in similar conduct—conduct that Plaintiff says the VA "explained away as being 'blunt' or 'telling it like it is.'" (Pl.'s Pet. at 8.) But as the AJ observed (and as Defendant has repeatedly emphasized), the VA did not sustain charges against the co-workers to whom Plaintiff is referring (Mitchell, Kirklin, and Hannah). (*See* R. Vol. 12 (MSPB Op.) at 270 (stating that because the VA never charged Plaintiff's comparators with the same misconduct, she "cannot find fault with the agency's decision to bring charges against [Plaintiff] but not" them).)[16] And, as explained earlier, although Willis was indeed charged with patient abuse, he was suspended for his first offense— just as Plaintiff was. (*See* R. Vol. 12 (MSPB Op.) at 270 (noting Willis's lack of prior discipline).) The AJ's conclusion that the VA proved a nexus between Plaintiff's misconduct and the agency's work was not arbitrary, capricious, or unsupported by substantial evidence.

### 4. The *Douglas* Factors

Plaintiff argues that the VA did not properly apply the *Douglas* factors in selecting her penalty and that the AJ rubber-stamped the VA's flawed analysis. In *Douglas*, the MSPB articulated 12 factors that are relevant to selecting an appropriate disciplinary measure. *See Douglas*, 5 M.S.P.B. at 332; *see also, e.g.*, *Robinson*, 923 F.3d at 1016 n.3. *Douglas* requires the agency to consider the factors, but "does not mandate that any particular factor be given special treatment, or that all factors be considered in every case without regard to their relevancy."

---

[16] The AJ refers to "two employees," *id.* whereas the portion of the administrative record cited by Plaintiff refers to three (Mitchell, Kirklin, and Hannah). (*See* Pl.'s Pet. at 8 (citing R. Vol. 7 at 1-32).) This discrepancy does not require reversal of the AJ's decision (and Plaintiff does not argue otherwise). Because the VA did not sustain charges against Mitchell, Kirklin, or Hannah, the AJ's logic applies equally to all three. Further, it is not clear to the court that Plaintiff presented evidence about all three comparators to the AJ.

*Zingg v. Dep't of Treasury, IRS*, 388 F.3d 839, 844 (Fed. Cir. 2004) (citing *Nagel v. Dep't of Health & Human Servs.*, 707 F.2d 1384, 1386) (Fed. Cir. 1983) ("The board never intended that each factor be applied mechanically, nor did it intend mandatory consideration of irrelevant factors in a particular case, or that it should be reversible error not to state expressly that a factor was considered and found irrelevant.")); *see also Douglas*, 5 M.S.P.B. at 332 ("Not all of these factors will be pertinent in every case, and frequently in the individual case some of the pertinent factors will weigh in the appellant's favor while others may not or may even constitute aggravating circumstances."). "Penalty decisions are judgment calls best left to the discretion of the employing agency," and the court "will not disturb a penalty unless it exceeds the range of permissible punishment or is so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion." *Gonzales v. Def. Logistics Agency*, 772 F.2d 887, 889 (Fed. Cir. 1985) (internal quotation marks omitted); *see also Guise*, 330 F.3d at 1382. Plaintiff's arguments that the VA and the AJ misapplied the *Douglas* factors are without merit.

### a. *Douglas* Factor Six

*Douglas* factor six is the "consistency of the penalty with those imposed upon other employees for the same or similar offenses." *Douglas*, 5 M.S.P.B. at 332. Plaintiff contends that Holt misapplied this factor because he admitted in his MSPB testimony that he considered "*ex parte* information related to non-disclosed cases." (Pl.'s Pet. at 9 (citing Oct. 2017 MSPB Hr'g. Tr. at 154, 161-62).) Plaintiff faults the AJ for upholding the VA's penalty decision notwithstanding this testimony. But Holt's testimony does not show that he deprived Plaintiff of relevant discovery. He explained that he did not request specific case files from the VA, but rather relied on his experience in deciding similar cases "based on the table of penalties." (Oct. 2017 MSPB Hr'g. Tr. (Holt Testimony) at 155:6-24.) For example, as the AJ noted, Holt testified that he considered how he has disciplined employees who have prior disciplinary records (like Plaintiff) in comparison to employees who do not (like Willis). (*See* R. Vol. 12 (MSPB Op.) at 276.)

Plaintiff also argues that her penalty was inconsistent with that of Willis, Bonjour, Mitchell,

Kirklin, and Hannah.  But for reasons already mentioned, the evidence supports the AJ's contrary conclusion.  Holt and the AJ both explained that the VA did not terminate Willis for patient abuse and inappropriate conduct toward a co-worker because the offenses were his first.  (*See id.* at 270, 276; *see* Def.'s Opp. at 12.)  Relatedly, Holt testified that Willis's lack of prior discipline was one of the reasons he decided to mitigate what was initially a proposed removal to a suspension.  (*See* Oct. 2017 MSPB Hr'g. Tr. (Holt Testimony) at 175:13-24; *see* Def.'s Opp. at 12 (citing same).)  Both Holt and the AJ noted that Willis apologized for his behavior but Plaintiff did not.  (*See* R. Vol. 12 (MSPB Op.) at 270, 276; Def.'s Opp. at 12.)  True, the AIB opined that Willis did not believe that the "Fourteen Principles of Ethical Conduct for Federal Employees" applied to him (*see* Pl.'s Pet. at 2-3; R. Vol. 6 (AIB Mitchell Report) at 299), but Holt apparently disagreed.  Whatever Willis's mindset may have been, the fact that he had no prior disciplinary record is adequate on its own to support a conclusion that his penalty was not inconsistent with Plaintiff's.  Plaintiff argues for the first time in her reply that the MSPB has determined that prior suspensions for unrelated charges cannot justify disparate penalties.  (*See* Pl.'s Reply in Supp. of Pet. ("Pl.'s Reply") [75] at 6-7 (citing *Gibbs v. Dep't of Treasury*, 21 M.S.P.R. 646, 651 (1984).)  In *Gibbs*, however, the MSPB did not articulate a bright-line rule.  *See* 21 M.S.P.R. at 651.  Rather, it determined that a prior suspension could not explain the disparity in that case, where the agency offered a different explanation for plaintiff's termination that was "not credible."  *Id.* at 650.  Additionally, it appears that the plaintiff in *Gibbs* had previously received discipline for unrelated misconduct.  *See id.* at 649.  Here, Plaintiff's first and second offenses were similar and Plaintiff received discipline for both within the same year.

Regarding Mitchell, Kirklin, and Hannah, the court reiterates that the VA did not sustain the charges against them for patient abuse or inappropriate conduct toward patients.  (*See* Def.'s Opp. at 13; R. Vol. 12 (MSPB Op.) at 270 (AJ recognizing same).)  In other words, those employees cannot be said to have committed similar misconduct, so the fact that they were not disciplined is not evidence of disparate treatment.  For the same reason, *Miskill v. Social Security*

*Administration*, 863 F.3d 1379 (Fed. Cir. 2017), cited by Plaintiff, is inapposite. *See id.* at 1384 ("[E]vidence regarding similarly-situated employees who received no discipline after committing similar misconduct would also support [a] disparate penalty claim." (internal quotation marks omitted)). Adequate evidence supports the AJ's conclusion that the VA's decision to penalize Plaintiff was not inconsistent with its decision not to penalize Mitchell, Kirklin, and Hannah.

Plaintiff's argument concerning the VA's failure to consider her accusations against Bonjour as a mitigating factor fare no better. Defendant does not address this argument but explains that in his briefing, he disregarded arguments that Plaintiff did not support with record cites. (*See* Def.'s Opp. 11.) Plaintiff did not provide a record cite for her Bonjour-related argument (*see* Pl.'s Pet. at 9), so the court concludes that Defendant's failure to address it was not a waiver. In any event, the AJ determined that Plaintiff's claim that Bonjour committed patient abuse was not credible (and, further, that it did not give him motive to lie about the events underlying Plaintiff's charges). Specifically, the AJ observed that neither Plaintiff nor Marshall reported the abuse when it allegedly occurred and instead raised the issue only after the VA proposed terminating Plaintiff. (*See id.* at 260.) The AJ noted that Plaintiff admitted she did not witness the alleged abuse; Marshall could not recall when it occurred; and Bonjour seemed surprised by the allegation when he testified before the AJ. (*See id.*) For the same reasons, the AJ concluded that Holt did not err in disregarding Marshall's letter and declining to investigate Bonjour. (*See id.* at 277.) This evidence adequately supports a conclusion the VA's decision to terminate Plaintiff was not inconsistent with its decision not to investigate Bonjour.[17]

### b.   *Douglas* Factor Seven

Plaintiff faults Holt for applying the penalty for "patient abuse" when the VA charged her

---

[17]    In a separate section of her Petition, Plaintiff maintains that the AJ "arbitrarily ignored relevant evidence and applied the wrong standard for comparators." (Pl.'s Pet. at 10.) She repeats the same arguments that the court has just rejected, so the court does not address them again.

40

only with inappropriate conduct toward patients. (Pl.'s Pet. at 9 (citing Oct. 2017 MSPB Hr'g. Tr. (Holt Testimony) at 206).) Plaintiff does not state which *Douglas* factor her argument pertains to, but the court assumes it is *Douglas* factor seven ("consistency of the penalty with any applicable agency table of penalties," *Douglas*, 5 M.S.P.B. at 332). Defendant does not address Plaintiff's argument about how the charge was labeled. Elsewhere in his opposition brief, however, Defendant argues that the AJ correctly found that the VA proved the charge of inappropriate conduct against patients. (*See* Def.'s Opp. at 8-10.) The alleged conduct underlying the charge, Defendant observes, is verbal *abuse* toward patients. (*See id.*) Because the actions underlying the "inappropriate conduct" charge were characterized as patient abuse, the court is satisfied that Holt's consideration of the penalty for patient abuse does not require reversal of the AJ's decision.

### c. *Douglas* Factor Ten

*Douglas* factor ten requires the employer to consider the "potential for the employee's rehabilitation." *Douglas*, 5 M.S.P.B. at 332. Plaintiff argues that Holt and the AJ improperly disregarded Fouse and Byrd's statements that they had "no particular issues" with Plaintiff; Fouse's "request[] that Richards be assigned to her permanently"; and Plaintiff's "fully successful" performance evaluations. (Pl.'s Pet. at 9.) But Holt and the AJ did explicitly consider Plaintiff's prior successful work history as a mitigating factor. (*See* R. Vol. 1 (Termination Ltr.) at 113; R. Vol. 12 (MSPB Op.) at 276; Def.'s Opp. at 11 (citing Holt's testimony concerning mitigating factors, including work history).) They also considered Fouse's support for Plaintiff (*see* Oct. 2017 MSPB Hr'g. Tr. (Holt Testimony) at 158:8-9; R. Vol. 12 (MSPB Op. at 277), but as Defendant notes, it did not carry the day. (*See* Def.'s Opp. at 11.) Among other things, the AJ noted that Fouse was not Plaintiff's supervisor at the time of the incidents in question. (*See* R. Vol. 12 (MSPB Op. at 263).) Further, both Holt and the AJ observed that there was no medical evidence supporting Fouse's statement that PTSD might affect Plaintiff's behavior. (*See id.* at 276-77; Def.'s Opp. at 11.) Finally, even if Byrd said she did not have issues with Plaintiff—a contention Plaintiff does not support with a record cite—the AJ considered her statement that she had seen Plaintiff

screaming at patients in the past.  (*See id.* at 262-63.)  This evidence supports a conclusion that Plaintiff was incapable of rehabilitation, as does the following:  she had been disciplined less than a year prior for patient abuse, she was unwilling to accept responsibility for her actions, and she "continuously blam[ed] others."  (R. Vol. 12 (MSPB Op.) at 277.)

### d. *Douglas* Factor Eleven

Douglas factor eleven concerns "mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter."  *Douglas*, 5 M.S.P.B. at 332. As noted, Holt and the AJ properly disregarded Plaintiff's contention that Bonjour had a motive to lie about her misconduct.  Likewise, because there are no medical records showing that Plaintiff might suffer from PTSD (*see, e.g.*, Def.'s Opp. at 11), Holt and the AJ also properly disregarded Fouse's speculation that such a condition might affect Plaintiff's job performance.  *Malloy v. U.S. Postal Service*, 578 F.3d 1351 (Fed. Cir. 2009), cited by Plaintiff, is inapposite.  There, the MSPB ignored medical records that showed the plaintiff had been diagnosed with a serious mental health problem.  *Id.* at 1356-57 (vacating the MSPB's removal decision and remanding for consideration of the plaintiff's mental health condition as a mitigating *Douglas* factor).

Plaintiff urges that Holt and the AJ also ignored evidence that her co-workers harassed her because of her disabilities.  She cites no evidence of this, however, and even if she had, other evidence—including her recent prior suspension for similar misconduct and the severity of her misconduct—is more than sufficient to support a conclusion that termination was the appropriate penalty.  Finally, as discussed below, the AJ properly determined that there is no evidence that Plaintiff's supervisors retaliated against her for protected activity.  Neither Holt nor the AJ erred in assessing *Douglas* factor eleven.

### e. *Douglas* Factor Twelve

*Douglas* factor twelve asks whether alternative sanctions would be adequate and effective to deter future misconduct by the employee.  *Douglas*, 5 M.S.P.B. at 332.  In maintaining that Holt

and the AJ did not properly consider this factor, Plaintiff rehashes arguments that the court has already addressed.  Holt determined that because the VA had disciplined Plaintiff for misconduct within the same year, it was "totally unclear" that there were alternative sanctions that would "prevent this behavior or minimize risk to patients and other staff."  (R. Vol. 1 (Termination Ltr.) at 114.)  Similarly, the AJ determined that the VA "was left with little choice but to remove [Plaintiff]" due to her "repeated misconduct and failure to accept responsibility."  (R. Vol. 12 (MSPB Op.) at 277.  Nothing about the AJ's analysis of *Douglas* factor 12 suggests it was arbitrary or capricious.

For the foregoing reasons, Plaintiff has not shown that the VA's choice of penalty was "wholly unwarranted in light of all the relevant factors."  *Guise*, 330 F.3d at 1382.

### 5.    Whistleblowing and Reprisal Claims

In her appeal to the MSPB, Plaintiff argued that the VA terminated her employment because she engaged in whistleblower activity:  filing complaints with the OSC and JCAHO.  The Whistleblower Protection Act ("WPA") prohibits government employers from retaliating for disclosures that "an employee . . . reasonably believes evidences (i) any violation of any law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety."  *Adam v. Dep't of Army*, 658 F. App'x 1032, 1034-35 (Fed. Cir. 2016) (quoting 5 U.S.C. § 2302(b)(8)(A)).  "Analysis of a whistleblower defense takes place within a burden shifting scheme."  *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1367 (Fed. Cir. 2012).  "[T]he agency must first prove its case for removal by a preponderance of the evidence, 5 C.F.R. § 1201.56, then the former employee must prove by a preponderance of the evidence that he or she made a protected disclosure under § 2302(b)(8) that was a contributing factor to the employee's termination."  *Id.*  "If the employee establishes this *prima facie* case of reprisal for whistleblowing, the burden of persuasion shifts to the agency to show by clear and convincing evidence that it would have taken 'the same personnel action in the absence of such disclosure.'"  *Id.* (quoting 5 U.S.C. § 1221(e)).

In this case, the AJ determined that the VA proved its case for terminating Plaintiff by a

preponderance of the evidence. Plaintiff thus bears the burden of showing that she made a protected disclosure that contributed to her termination. The AJ determined that Plaintiff did not do so, and that even if she had, the VA showed by clear and convincing evidence that it would have removed her absent the disclosure. (*See* R. Vol. 12 (MSPB Op.) at 266-67.) Because a reasonable factfinder could conclude that adequate evidence supports the latter conclusion, the court need not revisit the first.

As Plaintiff notes, the MSPB has held that when determining whether an agency has shown it would have disciplined an employee in the absence of whistleblowing activity, it considers "the strength of the agency's evidence in support of its personnel action; the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated." *Carr v. Soc. Sec. Admin.*, 185 F.3d 1318, 1323 (Fed. Cir. 1999). Although the AJ did not cite *Carr*, she considered evidence relevant to these factors. As Defendant notes, the AJ concluded there was ample evidence supporting the VA's decision to sustain the charges against Plaintiff. (*See* Def.'s Opp. at 7-10, 15.) Regarding an alleged motive to retaliate for whistleblowing activity, Plaintiff argues only that a Congressman previously accused Holt of having a subordinate alter a document and that Holt therefore "would be sensitive to another stain on his career." (Pl.'s Pet. at 11.) Defendant responds that Plaintiff did not offer any evidence about this incident and, further, that at the MSPB hearing, Plaintiff's counsel "specifically objected to Dr. Holt explaining what occurred." (Def.'s Opp. at 14.) Plaintiff does not dispute these representations. Accordingly, it was reasonable for the AJ to conclude that Holt lacked any motive to retaliate against Plaintiff for her alleged whistleblowing activity. (*See* R. Vol. 12 (MSPB Op.) at 267.) Significantly, in making that finding, the AJ also observed that she found Plaintiff's testimony about her whistleblowing activity to be "vague, reactive, and less than credible." (*Id.*) In maintaining that the VA treated similarly situated employees without protected activity more favorably, Plaintiff points to the same Nursing

Assistants she discusses in relation to her other claims. (*See* Pl.'s Pet. at 10; Pl.'s Reply at 4-6.) The AJ did not address comparators in the whistleblower section of her decision, but she explained in other sections of her decision that the VA did not treat similarly situated employees less harshly. (*See* Def.'s Opp. at 2, 11-13.) A reasonable factfinder could determine that the AJ properly concluded that the VA would have terminated Plaintiff in the absence of protected activities or disclosures. (*See* R. Vol. 12 (MSPB Op.) at 267.)

Plaintiff argues that the AJ gave "cursory treatment" to "the agency's clear and convincing burden of proof" and relied solely on "general denials by the deciding official" (Pl.'s Pet. at 12, 13), but the factors discussed in the previous paragraph above show otherwise. Plaintiff is simply misguided in contending that Defendant made no attempt to argue that the VA proved by clear and convincing evidence that it would have removed her absent whistleblowing activity. (*See, e.g.*, Pl.'s Reply at 1, 5.) The cases she cites, where evidence on the *Carr* factors was lacking or where "general denials by the deciding official" were deemed insufficient, are inapposite. (*See id.*) The AJ's finding that Plaintiff did not establish her affirmative defense of whistleblower retaliation was not arbitrary, capricious, or unsupported by substantial evidence.

### 6. Other Affirmative Defenses

The court need not address whether the AJ erred in rejecting Plaintiff's other affirmative defenses (retaliation for EEO activity, failure to accommodate, disparate treatment based on disability, and violation of FMLA rights) because the court has reviewed those claims *de novo* and concluded that they lack merit.

45

## **CONCLUSION**

For the foregoing reasons, the court grants Defendant's Motion for Summary Judgment [60] and denies Plaintiff's Petition for Review of an Administrative Decision [62].

ENTER:

Dated:   September 27, 2020

_____

REBECCA R. PALLMEYER
United States District Judge

46